The plaintiff, Emile Eleazar, received personal injuries on March 23, 1944, at about 6:45 a.m., when the taxicab, in which he was riding as a passenger, was struck by a switch engine of the Illinois Central Railroad Company while proceeding over the railroad tracks located on Labarre Road in the Parish of Jefferson. Alleging that the accident resulted from the joint and combined negligence of the driver of the taxicab and the engine crew of the railroad company, plaintiff brought this suit in the 24th Judicial District Court for the Parish of Jefferson to recover damages in the sum of $10,194. He joined, as defendants to the action, Toye Brothers Yellow Cab Company, a commercial copartnership and owner of the cab in which plaintiff was riding, the individual partners thereof John Cubre, the cab driver, Illinois Central Railroad Company, and its engineer, T.J. Coyle.
The cab company and its driver and the railroad company and its engineer filed separate answers to the plaintiff's petition in which they admitted the happening of the accident, but denied any negligence on their part. The cab company and Cubre contended in their answer that the accident was caused solely through the fault of the railroad company — in that the locomotive was being operated at an unlawful speed and without lights; that the engineer thereof failed to ring the bell within three hundred yards of the crossing in violation of the law and that he failed to observe the cab approaching the crossing within sufficient time to avoid colliding with it, despite the fact that, if he had been keeping a proper lookout, he would have been able to do so. The railroad company, on the other hand, charged that the accident resulted exclusively from the fault of the cab driver — in that he approached the crossing at a reckless rate of speed and failed to observe the stop signs located there, and pre-empted the crossing notwithstanding the fact that the locomotive was approaching with bright lights, its bell ringing and its whistle blowing.
T.J. Coyle, the engineer of the train involved in the accident, died before the trial and, on motion of plaintiff, the suit was dismissed as to him. Thereafter, the matter proceeded to trial on the issues formed by the pleadings. After the hearing, the judge, being of the opinion that the accident was caused solely as a result of the negligence of the cab driver and that the railroad company was without fault in the premises, granted plaintiff a judgment against the taxicab company, its individual members and John Cubre, in solido, for the sum $4,694 and dismissed his suit against the railroad company. The taxicab company, its individual members and Cubre have appealed from the adverse decision and plaintiff has appealed from the judgment, insofar as it dismisses his suit against the railroad company. In addition, plaintiff has answered the cab company's appeal praying for an increase in the damages awarded by the district judge.
A careful review of the voluminous record (which consists of over three hundred fifty pages of testimony) reveals that the main questions presented for decision are ones of fact. The undisputed facts of the case are as follows:
The accident occurred about dawn on a misty morning on the northbound main track of the railroad company at its intersection with Labarre Road. Labarre Road is a gravel, two-way thoroughfare located in Jefferson Parish, extending from the Mississippi River towards Lake Pontchartrain and is a connecting link between Highway No 51 (Airline Highway) and Highway No. 90 (Jefferson Highway). It is about 30 feet wide and intersects a succession of railroad tracks (Illinois Central, Texas Pacific and New Orleans Public Belt) at right angles at or near the property of New Orleans Cotton Compress Company which was, at the time of the accident, occupied by the U.S. Government and referred to as New Orleans Intransit Depot No. 7. *Page 389 
Prior to the accident, plaintiff had hired the taxicab in New Orleans to transport him to his home located at the Cotton Club, which abuts Highway No. 90 in Jefferson Parish. He was driven out the Airline Highway at a speed of approximately 30 miles per hour and thence into Labarre Road, where the cab's speed was decreased. As the cab driver approached the railroad crossing, he was required to negotiate several railroad tracks. Proceeding in the direction of the Mississippi River, the driver was confronted with the usual stop sign commonly found at railroad crossings. This sign is located on the right side of the roadway near the first track, which is a switch track leading to the property of the New Orleans Compress Company. Thirty feet from this track, situated on an embankment about four feet above ground level, is the northbound main track of the Illinois Central on which the accident occurred. Further west at a distance of 14.8 feet is another track of the Illinois Central known as "long cross-over" and 103 feet further distant from the main northbound track is the Illinois Central's southbound main track. Further on is a track of the Texas Pacific Railroad and still further are two tracks of the New Orleans Public Belt Railroad. In addition to the stop sign, situated near the first or switch track, are two other similar signs which engage public view upon approaching the crossing.
The equipment of the Illinois Central involved in the collision was a switch engine with tender which was being moved from Government yard to May's yard over the northbound main track. This engine was engaged in a backing operation with its tender proceeding in front. The crew consisted of the engineer, T.J. Coyle, now deceased (from causes other than the accident), the fireman, R.J. Garon, and the engine foreman, C.J. Masson, who was in charge of the operation. Just as the taxicab came over the northbound main track at Labarre Road crossing, it was struck on its left side near its rear by the tender of the oncoming engine with sufficient force so as to cause it to be knocked or shoved some 30 feet north from the point of impact, where it came to rest in a ditch or depression (separating the northbound track from the "long cross-over") with its front end facing in a southerly direction.
[1, 2] Before discussing the evidence relative to the negligence of the cab driver or the operators of the engine, it is well to consider the relationship of all of the parties involved. Plaintiff was a paid passenger in the cab and, therefore, under the contract of carriage, was entitled to safe transportation to his destination. And the law imposed upon the cab driver the duty of exercising the highest degree of care so that any infraction or dereliction of duty, however slight, which had causal connection with the accident, renders the cab company and its operator responsible for plaintiff's damages. On the other hand, the duty which the railroad company owed plaintiff was merely ordinary care — that is, the obligation imposed by Article 2315 of the Civil Code upon all persons to repair any damage inflicted upon another as a result of fault. Therefore, unless the preponderance of evidence reveals that the operators of the locomotive were guilty of acts of negligence which had causal connection with the accident, no responsibility ensues.
[3] The substance of the taxicab driver's statement is that, when he reached Labarre Road from Airline Highway, he reduced the speed of the cab to 15 miles per hour or less; that he proceeded on slowly until he reached the railroad crossing (with which he was very familiar), at which time he slowed the forward motion of the cab down to practically a stop; that he did not see the approach of the train; that, after he negotiated the switch track, he came to a complete stop at the base of the embankment on which rested the northbound main track; that, upon failing to observe the presence of the train, he proceeded slowly in first gear up the elevation and onto the track; that, just as he did so and while the cab was straddling the track, he became aware, for the first time, of the presence of the locomotive, which, he says, was proceeding without lights and that, almost simultaneously, the cab was struck on its left side by the tender.
The testimony of the cab driver is the only evidence to sustain the contention of the cab company that it was free from negligence in the premises. All of the other witnesses, i. e., plaintiff, Masson, the engine foreman, Garon the fireman, and Scarlata (an allegedly disinterested witness produced by the railroad company who says that he saw the accident), avouch that Cubre did not heed the stop signs and that he proceeded over the crossing without bringing the cab to a complete stop. Plaintiff *Page 390 
says that the driver slowed down to a creeping pace but that he did not stop — whereas Masson, Garon and Scarlata declare that he went over the crossing at a comparatively fast rate of speed without paying any attention whatever to the oncoming engine which had an electric headlight burning brightly on the tender and was proceeding with bell ringing and whistle blowing. There is, therefore, a clear preponderance of evidence against the cab company on this point alone and, as a consequence, we hold that the district judge did not commit error in deciding that it was responsible for plaintiff's damages.
Moreover, we are convinced that the testimony of the railroad company's witnesses (that the locomotive approached the crossing with an electric headlight burning on the tender; that its whistle was blowing and that, despite this, the cab driver came over the intersection at a fair rate of speed without exercising a proper lookout or taking all necessary precautions) prevails over the contrary evidence of the cab driver and the plaintiff's testimony that he neither saw the light nor heard the bell ring and whistle blow. Masson and Garon, the engine foreman and fireman respectively, state that they were located on the lake side of the locomotive during its approach to the crossing; that they had a clear view of traffic on the lakeside of Labarre Road; that it was their duty to look for such traffic and that they saw the cab on its approach to the crossing, traveling at a rapid speed which continued unabated until the occurrence of the accident. They also declare that, as soon as they noticed the cab and realized that it was not going to stop, they communicated this fact to the engineer, who immediately applied his brakes in an attempt to avert the collision.
Hence, according to the testimony of Masson and Garon which we accept as giving a fairly accurate and truthful picture of the circumstances appearing at the time of the accident, it is clear that the primary cause of the collision was brought about through the fault of the cab driver. However, relative to the liability of the railroad company, the question arises as to whether its employees, in the circumstances presented to them, had a reasonable opportunity to have brought the locomotive to a complete stop before it entered the crossing and thereby avert the mishap — for, if such an opportunity were apparent to them and they failed to act with dispatch, their failure in this respect must be regarded as a contributing fault which had causal connection with the accident.
When we come to consider this point, we are confronted with an irreconcilable conflict in the testimony of Garon and that of Masson, which, when considered in connection with another undisputed fact, reveals that either one or the other is in error. The uncontroverted fact, to which we refer, is found in the evidence of Mr. Herbert Morrison, who was placed on the stand by the railroad company as an expert to testify concerning the distance in which it takes to stop the switch engine in question while traveling at a speed of 20 to 25 miles per hour (the admitted speed at which the engine was traveling at the time it approached the Labarre Road crossing). Mr. Morrison stated that he had made tests with switch engine No. 266 and that, proceeding in a backing up movement at a speed of 25 miles per hour, it could not be brought to a complete stop in less than 300 feet. Masson testified that, when the engine was brought to a stop, it was straddling the crossing and that the tender had cleared it. Garon differs but slightly with Masson, for he stated that, after the impact, the tender was blocking the crossing. However, when we consider their statements relative to distance from the crossing at which the brakes were applied by the engineer, we find them to be in utter conflict with the expert testimony of Mr. Morrison — for Garon declared that the brakes were applied at a point 12 feet from the crossing and Masson estimated that it was either 10 or 15 feet. Obviously, then, Masson and Garon are in error — for, if the brakes were applied by the engineer only 15 feet from the crossing, the engine or tender, as the case may be, could not be brought to a complete stop within that distance at a speed of 25 miles per hour.
Moreover, Garon and Masson contradict each other in the following particulars: Garon stated that he and Masson had a clear view of the crossing through the window of the cab on the left side of the engine; that, when the locomotive was only 12 feet from the crossing, he saw the taxicab approaching at a speed of 35 miles per hour; that he and Masson "hollered' to the engineer in unison that the cab was attempting to beat the engine over the crossing and that, Coyle, the engineer, immediately applied his brakes and came to a full stop as soon as the collision occurred. *Page 391 
Masson, on the other hand, states that, when the locomotive was 1000 feet from Labarre Road, he saw the taxicab about four to five hundred feet from the track; that, when the engine reached a point about 600 feet from the crossing, he realized that it was not going to stop and immediately notified the engineer, who simultaneously started to apply his brakes; that the brakes were actually applied when the engine reached a point about 10 to 15 feet from the crossing and that the locomotive was brought to a stop on the crossing immediately after the tender struck the cab. On cross-examination Masson was asked the following question:
"Q. In spite of the fact that you told the engineer six hundred feet away from the crossing that it looked like the cab was going to try to beat you over the crossing, he did not put on the brakes until your engine was about ten (10) feet from Labarre Road; is that right? A. Yes."
It seems manifest that both Masson and Garon are mistaken as to the point where the engineer applied the brakes forasmuch as it is plain that, if the brakes were applied at a point only 10 or 15 feet from the crossing, the locomotive could not have been brought to a complete stop until it had proceeded at least some 200 feet north of the intersection. And, since Masson and Garon are both positive in their statements that the engine was brought to a stop at or very near the crossing (which testimony we think preponderates over the evidence of the cab driver that it came to rest at least 150 feet north thereof), we are necessarily required to conclude that the engineer actually applied his brakes at a point no less than 250 feet to the south of Labarre Road.
Then, too, Garon and Masson contradict each other as to the distance from the crossing at which the cab was first observed and warning given to the engineer. In this situation, we are compelled to ascertain whether Garon is correct when he says that the warning to the engineer was given twelve feet from the crossing or whether Masson's statement is genuine that the warning was given 600 feet away.
Counsel for the railroad company find themselves in a dilemma in attempting to explain the variance in Masson's and Garon's testimony. They assert that it is apparent that both witnesses are in error as to their estimate of distances, maintaining that Garon obviously underestimates the distance when he says that the train was only 12 feet from the crossing and that Masson overestimates when he fixes the distance at 600 feet. It is further contended by counsel that Masson's error is more palpable than that of Garon for the reason that a map which the railroad company offered in evidence and pictures taken of the scene of the accident show that there were large steel gasoline drums piled high to the south and on the lakeside of the crossing which obscured the witnesses' vision of Labarre Road and the taxicab until the latter reached a point 140 feet from the track.
We, however, find that this last contention is merely a theory of counsel, as Masson stated positively that his view of the crossing and of the taxicab proceeding on Labarre Road was unobstructed and that he saw the taxicab when it was four to five hundred feet from the crossing at a time when the engine was 1000 feet away. Then again, despite counsels' protest to the contrary, it seems patent that we have no right to theorize that both Masson and Garon are mistaken in their estimates in view of their positive statements which are binding on the railroad company. Obviously, one or the other is mistaken and we are called upon to determine which one is in error. Masson is shown to be a man of maturity and experience, having been employed by the Illinois Central for thirty-three years. He was the engine crew foreman of the locomotive in question and the entire switching operation was under his supervision and control. He also states that it was his duty to keep a lookout for traffic whilst the engine was approaching Labarre Road and that he knew that there was considerable traffic over the crossing during 1944 as a result of wartime operations. On the other hand, Garon was a young man sixteen years of age at the time of the accident. He was employed in the capacity of fireman and was undoubtedly primarily interested in his duties, as such, at the time the locomotive approached the crossing. Consequently, when consideration is given to these facts and circumstances, it appears to us that Garon's estimate that the locomotive was only 12 feet from the crossing at the time the engineer was notified of the presence of the approaching cab is not only wholly inaccurate but that the testimony of Masson that the engine was 600 feet away is logical and persuasive, as it is in accord with the physical facts and probabilities of the situation. *Page 392 
It, therefore, becomes certain that, if Masson's statement and estimates are accepted, the engineer was guilty of negligence for he had fully 600 feet from the time he was notified by Masson of the emergency, which had been created by the taxicab, to have adequately applied his brakes, stop the forward movement of the engine and thus avoid the collision.
[4] We note in the brief of counsel for the railroad company that they maintain, technically, Masson is not a witness for the railroad company, as he was called by plaintiff as his witness. In this contention, we think that counsel are in error, as the record shows that Masson was called for cross-examination by counsel for plaintiff.
[5] In addition, counsel maintain that, when Masson states that he first notified the engineer that the taxicab was attempting to beat the engine across the intersection, it is probable that the train crew were under the belief that the cab driver would obey the law and accord to the engine the right of way and that it was not until the engine was some 15 feet from the crossing that it was deemed necessary to apply the brakes. This argument does not impress us for the reason that Masson stated that he warned the engineer once only and that the engineer immediately let go of the whistle cord and applied his brakes. In these circumstances, only one of two things could have happened, i. e., the engineer either failed to employ a full emergency stop or he did not apply the brake as soon as he let go the whistle cord. In either case, he was guilty of negligence.
Thus, we conclude that, whereas the negligence of the taxicab driver was the initial cause of the accident, the employees of the railroad company were also guilty of fault which contributed to it by failing to exert a reasonable effort to avoid it when they had adequate time to do so by use of the means within their control. It follows that the cab company, its driver, and the railroad company are responsible, in solido, for plaintiff's damages.
The only other question presented in the case is the quantum of damages. The district judge awarded $4,694. Of this sum, $694 represents actual expense and loss of wages incurred by plaintiff as a result of the accident. Plaintiff has asked that the judgment be increased to the amount sued for and the defendants maintain that the award of the trial judge is grossly excessive. We do not find it necessary to discuss plaintiff's application for an increase as we are convinced that the allowance of the district judge represents liberal compensation for the injuries sustained by plaintiff and the suffering he endured. The serious question is whether the allowance is excessive when considered in the light of our recent jurisprudence.
As the result of the accident, plaintiff suffered painful physical injuries. The undisputed evidence of all the physicians testifying in the case reveals that he sustained a fracture of the left metacarpal bone of the left hand resulting in slight posterior angulation and fractures of the second, third and fourth metatarsal bones of the left foot, causing a depression of the interior arch and abnormal callosity of the sole of the foot. In addition, he suffered the usual Contusions and abrasions common to accidents of this type.
Shortly after the accident, plaintiff was taken by the Yellow Cab Company to the Baptist Hospital where he was confined for treatment for five days. Dr. Dyer J. Farley, physician for Yellow Cab, discovered from X-rays made at the hospital that plaintiff had sustained the fractures of his left foot as above described. For immediate treatment, he applied splints to the injured member' and later, on March 29th, the foot was placed in a plaster cast with a "walking tread", which plaintiff was required to wear for a period of fifty-five days. Dr. Farley did not discover the fracture in plaintiff's hand, despite plaintiff's repeated complaints that he was suffering pain in that member. Subsequently, however, on April 12, 1944, plaintiff consulted his own physician, Dr. Kermit Breau, who ordered additional X-rays taken. These X-rays revealed that plaintiff had suffered a fracture of the left metacarpal bone of his hand.
At the time of the accident, plaintiff weighed one hundred seventy-eight pounds and, on the date of the trial, his weight was two hundred five. He ascribes this increase in weight to the fact that, prior to the accident, he was active and healthy and that, since his injuries, he had been unable to pursue the normal exercise which he had formerly taken. He is fifty-three years old and has been employed as manager of the Cotton Club, which is a night club or pleasure resort located in the Parish of Jefferson. His duties as manager include tending *Page 393 
bar which requires him to stand on his feet for several hours each night. He received a salary of $50 per week, in addition to his room and board. He says that, for three months after the accident, he was unable to perform the duties required of him at the club and that he refused to accept any salary from his employer, although he was furnished with meals and lodging. He further declared that, since he has resumed his duties as manager of the club, he is unable to get around as efficiently as he did prior thereto. The doctors prescribed that he wear a support arch in his left shoe and plaintiff says that he cannot stand for any length of time without the aid of this support.
Plaintiff's evidence on this score is corroborated by the testimony of Dr. George C. Battalora, an orthopedist, who examined him on October 28, 1944. Dr. Battalora declares that plaintiff has sustained a serious and painful injury to his left foot and that, even with the use of the arch support, there is a ten percent permanent loss of function of the member.
[6-9] The judge of the lower court found that plaintiff had proved to his satisfaction that he had sustained actual damages in the sum of $694. We find no error in his ruling. In addition, the judge allowed $4,000 as compensatory damages for plaintiff's pain and suffering and the permanent injury to his foot. We have often said that it is difficult to gauge with exactness the amount for which recovery should be permitted for personal injuries. However, our previous jurisprudence affords a guide by which a fair standard of damages for particular hurts can be estimated. In cases involving broken bones and the disability ensuing therefrom, there is not a marked variance in the older cases respecting the award to which the injured persons are entitled. More recently, however, we have recognized that, because of the decreased purchasing power of the dollar, larger allowances should be permitted than heretofore. Thus, in the case of Hero v. Toye Brothers Yellow Cab Co., La. App., 19 So.2d 687, we approved an award of $3,000 for the fracture of a leg where there were no other serious consequences or permanent injuries. When we compare the injury of young Hero with the hurts sustained by plaintiff in the instant matter, we are convinced that plaintiff's injuries (and the after effects produced thereby), are more serious and entitle him to a larger award. Hence, we conclude that the allowance of $4,000 is just and proper.
For the reasons assigned, the judgment appealed from is affirmed as to the Yellow Cab Company, its individual copartners and John Cubre; but it is reversed, insofar as it dismisses plaintiff's suit against Illinois Central Railroad Company, and it is now ordered, adjudged and decreed that there be judgment herein in favor of plaintiff, Emile Eleazar, and against Illinois Central Railroad Company, Toye Brothers Yellow Cab Company, its individual members, Frank E. Toye, George A. Toye, Joseph Toye and Paul Toye, and John Cubre, in solido, for the sum of $4,694, with legal interest thereon from judicial demand until paid; and all costs.
Affirmed in part; reversed in part.
WESTERFIELD, J., absent, takes no part.